UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                                    CASE NO. 8:21-cr-244-MSS-AAS

TATIANA POWER,
A/K/A "TANYA POWER,"
A/K/A "TANIA POWER"

## UNITED STATES' SENTENCING MEMORANDUM

The United States files this sentencing memorandum requesting that this Court sentence the defendant, Tatiana Power, to a guidelines sentence.

### I.      Background

From as early as 2009 but likely much earlier, Tatiana Power ("Power") began working for the Newstar Enterprise—an internet-based business run by her late husband, Kenneth Power ("K. Power"), aimed at for-profit sexual exploitation of vulnerable children. The Enterprise created and operated the Newstar Websites, which were a collection of websites that purported to promote "child modeling," but which in fact sold child pornography and child erotica. Doc. 29 at 21–23. For at least 10 years and likely several more, Power—knowing that the Newstar Enterprise existed solely to support and facilitate the Newstar Websites and with knowledge of the Websites' content—helped run the Newstar Enterprise by overseeing its finances. Doc. 29 at 28. Power served as the Enterprise's bookkeeper, routinely assisted in the making of millions of dollars of payments to other Newstar Enterprise conspirators and counseled her coconspirators on how to evade law enforcement. Doc. 29 at 28.

In January 2022, Power pleaded guilty by plea agreement to money laundering conspiracy. Docs 29–30. Her sentencing hearing is set for April 13, 2022, at 1:30 p.m. Doc. 34.

## II.    Presentence Investigation Report

On March 29, 2022, the U.S. Probation Office issued its Final Presentence Investigation Report (PSR). Doc. 41. The Probation Officer determined that Power's applicable guidelines range for the underlying offense is 240 months' imprisonment, based on an adjusted total-offense level of 43, a criminal history category of I, and a statutory maximum penalty of 240 months.[1] PSR ¶82. The applicable period of supervised release is a maximum of three years. PSR ¶85.

The parties have no remaining factual or legal objections to the PSR. For the reasons that follow, this Court should adopt the PSR's facts and guidelines calculation.

## III.    Argument in support of a guidelines sentence

Power's conduct, taken with the sentencing factors set forth in 18 U.S.C. § 3553(a), calls for a guidelines sentence. For more than a decade, Power and her husband ran an enterprise engaged in sexually exploiting impoverished or otherwise vulnerable children, defrauding financial institutions, and laundering millions of dollars. Power persisted in her conduct even after law-enforcement contact and actively

---

[1] Power proffered and cooperated with the United States. We have filed a substantial assistance motion under U.S.S.G. §5K1.1 requesting a two-level departure in recognition of Power's cooperation. Doc. 44. Were this Court to grant that motion, Power's guideline range would remain at 240 months' imprisonment.

attempted to evade and obstruct justice. This Court should impose a guidelines sentence.

Although this Court may not presume that a guideline-range sentence is reasonable, the guidelines remain a significant and pivotal component of the sentencing process. *United States v. Delva*, 922 F.3d 1228, 1257 (11th Cir. 2019); *United States v. Hunt*, 526 F.3d 739, 746 (11th Cir. 2008) ("[W]hile we do not presume that a sentence falling within the guidelines range is reasonable, we ordinarily expect it to be so."). This Court therefore "must first calculate the Guidelines range, and then consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors, 18 U.S.C. § 3553(a), explaining any variance from the former with reference to the latter." *Nelson v. United States*, 129 S. Ct. 890, 891–92 (2009).

Section 3553(a)(1) provides that, in determining a sentence, courts must consider the nature and circumstances of the offense, as well as the history and characteristics of the defendant. Additional factors outlined in section 3553(a)(2) include the need for the sentence to reflect the seriousness of the offense; to promote respect for the law; to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed education or vocational training, medical care, or other corrective treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). Consideration of these factors necessitates a guidelines sentence.

### A.   Nature and circumstances of the offense

The seriousness and duration of Power's offense conduct demonstrates the necessity of a guidelines sentence. Power did not suffer from a solitary lapse in judgment. Her conduct was calculated and premeditated. For over a decade, Power managed the financial affairs of a child exploitation enterprise run by her husband that victimized over one hundred vulnerable children in Eastern Europe. A guidelines sentence is a just sentence in this case.

### 1.   The Newstar Websites explained

Founded around 2005 by K. Power, the Newstar Websites were a collection of websites, hosted on servers in the United States and abroad, that were purportedly dedicated to legal child modeling. But in reality, the Newstar Websites were designed to and did advertise, sell, distribute, and otherwise make available child pornography and child erotica depicting the supposed child "models." The Newstar Websites were comprised of several subcategories of websites: the Newstar Model Collection sites, Clipmonster.net, Tiny Model News, and Cyber-pay.net.[2]

---

[2] This Court previously received and reviewed in chambers the rebuilt Newstar Model Collection webpages. *See United States v. Wilowski*, No. 8:21-cr-206-MSS-TGW, Doc. 33. A review of those webpages reveals that none of the Newstar Websites known to law enforcement depict non-sexualized children. The websites universally depict sexualized images of child "models." Moreover, transaction data seized from the servers shows that Newstar content was the predominant (and likely the sole) content sold on the Newstar Websites from approximately 2010 until 2019.

i.   *The Newstar Model Collection*

The Newstar Model Collection included over 100 separate, clear-net websites hosted at separate URLs.[3] In general, each website was dedicated to a specific brand or line represented by a child-victim. The child-victims depicted on the Newstar Model Collection sites ranged between approximately six to 17-years old. Typically, the child-victim's stage name appeared in each Newstar Model Collection website's name and URL, alongside the words "Newstar," "Tinymodel," or "Sweet." For example, the Newstar Model Collection websites featured lines/brands named "Newstar [C.]," "Sweet [G.]" and "Sweet [L.]."

The Newstar Model Collection sites normally touted an opening disclaimer, alleging that the content was "…100% legal non nude." *See*, *e.g.*, Ex. A. A common second disclaimer expressly declared that the content did not run afoul of Title 18, United States Code, Chapter 110 and referred the visitor to 18 U.S.C. § 2256 (defining sexually explicit conduct). *See*, *e.g.*, Ex. A. Federal courts have uniformly held, though, that non-nude content may still constitute chargeable child pornography when it includes a lascivious exhibition of a minor's clothed genitals or pubic area. *See, e.g., United States v. Knox*, 32 F.3d 733, 737 (3d Cir. 1994); *United States v. Williams,* 444 F.3d 1286, 1299 (11th Cir. 2006) ("pictures needn't always be 'dirty' or even nude depictions

---

[3] The "Newstar Model Collection" is a moniker given to a series of sites hosted by the Newstar Enterprise that included thew term "Newstar" in the sites' branding and were otherwise managed and hosted by K. Power and Power Trading Inc. In January 2021, Kenneth Power was indicted in the Middle District of Florida. *United States v. Power*, No. 21-cr-32-SDM-AAS, Doc. 1. He died in federal custody shortly after his detention hearing.

to qualify" as child pornography), *overturned on other grounds*, 553 U.S. 285 (2008); *United States v. Hunter*, 720 F. Appx. 991, 996 (11th Cir. 2017) ("a photograph can be lascivious even if the child is not naked and the depiction is not 'dirty'"); *United States v. Butler*, -- F. Supp. 3d --, 2021 WL 4553201, at *3 (M.D. Fla. Oct. 5, 2021) (video of 14-year-old wearing two-piece swimsuit included lascivious exhibitions of the minor's clothed genitals or pubic area).[4]

After navigating past these prompts, a visitor would then encounter the "model" homepage, usually depicting a large image of the child-victim. *See*, *e.g.*, Ex. B. Past the homepage, users encountered gallery preview images, as depicted below.



---

[4] *Accord United States v. Price*, 775 F.3d 828, 830, 833 (7th Cir. 2014) ("There is no nudity requirement in the statutory definition of 'sexually explicit conduct,' of which 'lascivious exhibition of the genitals or pubic area' is a part."); *United States v. Helton*, 302 F. Appx. 842, 844 (10th Cir. 2008); *United States v. Villasenor*, 236 F.3d 220, 224 (5th Cir. 2000); *United States v. Carroll*, 190 F.3d 290, 297-98 & n.7 (5th Cir. 1999), *withdrawn and reinstated in part on reh'g*, 227 F.3d 486 (5th Cir. 2000); *United States v. Horn*, 187 F.3d 781, 789-90 (8th Cir. 1999).

Next, visitors were prompted to subscribe for more content. *See*, *e.g.*, Ex. C. Multiple subscription plans were offered, most recently priced at $49.99 (34 days), $79.99 (60 days), and $99.99 (90 days). Accepted forms of payment on the Newstar Websites included credit cards and crypto currency.[5]

Although many of the preview gallery images depicted children engaged in sexually explicit conduct, the images usually grew more sexualized behind the paywall. Once inside the paywall, users had access to hundreds of galleries featuring the particular Newstar "child model" line, which they could download as ZIP files. *See*, *e.g.*, Ex. C; Ex. D.



Each Newstar Model Collection site hosted galleries of images of the respective child-victim. Although never fully nude, some of the depictions showed minors engaged in sexually explicit conduct. For example, the sites hosted images of child-victims dressed in transparent underwear,

---

[5] Over the course of their operation, the Newstar Websites made 814.18 BTC. But Newstar Enterprise members would immediately convert the BTC into U.S. dollars. The current value of 814.18 BTC is approximately $40 million.

bikinis, or sexually suggestive costumes, while exhibiting their clothed genitals and public areas in a lascivious manner. Ex. E; *see also* Ex. D; Doc. 29 at 22–26.

The Newstar Model Collection pages also commonly advertised and linked to other Newstar Model Collection sites through advertising banners. Ex. F. These banners helped usher users to new content and "models" featured across the Newstar universe. *See* Ex. F. A number of the advertisement images, banners, and previews published on the Newstar Websites themselves displayed minors engaged in sexually explicit conduct.



The Newstar Model Collection sites also contained links to additional content—usually video content—of any given Newstar model, which was hosted and sold on a collateral yet integrated platform, Clipmonster.net.

     *ii.   Clipmonster.net*

Clipmonster.net was a platform integrated into the Newstar Model Collection webpages, hosting additional content of the child-victims and lines featured on the

Newstar Model Collection pages. Clipmonster.net was commonly connected to the various Newstar Model Collection sites through links and advertising banners. *See*, *e.g.*, Ex. G. Users who navigated to the Clipmonster.net page populated for any given Newstar Model Collection site would be offered à la carte content for that particular "child model," as pictured below:



Some of the content depicted and sold on Clipmonster.net involved minors engaged in sexually explicit conduct. *See*, *e.g.*, Ex. G; Doc. 29 at 22–25. For example, the Newstar Websites, Clipmonster.net page, hosted and sold a video depicting 6-to-9-year-old child victim "Sweet [C.]." In the video, the child-victim wore a revealing, two-piece garment that left most of her torso and her legs bare. The video captured her gyrating, dancing, and tossing her hair while techno music played in the background. At one point in the video, she knelt on the ground, spread her legs, and briefly thrusted her pelvis. Another video hosted on the site depicted the same child-victim wearing the same revealing outfit. She again danced and tossed her hair, thrusted her pelvis and

rubbed her hands against her body in a sexual manner. At one point in the video, she knelt and spread her legs slightly for the camera. At another point, she pulled one strap of her tank top down over her shoulder. The preview image for these two videos depicted the most sexually explicit moments of each video. The first depicted the female kneeling on one knee and leaning back on her hands while spreading her legs. In the second preview image, the girl again knelt on one knee while lifting the other leg into the air, spreading her legs for the camera. Doc. 29 at 22–25.

     *iii.    Tiny Model News*

The Newstar Websites also included a website named "Tiny Model News"—a stand-alone site dedicated to reporting on and advertising content available across the Newstar Websites.  The Tiny Model News site featured pictures of the day, showcased child-victims' headshots with sexually charged captions, and even provided Newstar patrons with tips on how to evade law enforcement. Ex. H.



*iv.*   Cyber-pay.net

Cyber-pay.net was a payment-processing tool and website used by the Newstar Model Collection sites and by Clipmonster.net to process credit card and crypto-currency purchases for all content and access sold on those sites. Doc. 29 at 22. The Newstar Enterprise built, maintained, hosted and used cyber-pay.net to process transactions for subscription-memberships or for the purchase of individual images and videos from the Newstar Websites. Doc. 29 at 23.

2.   <u>The Newstar Enterprise</u>

The Newstar Enterprise was a network of individuals (both United States citizens and foreign nationals) as well as associated corporate entities, fraudulently opened payment processing accounts and bank accounts controlled by those individuals, that sourced, ordered, produced, advertised, sold for profit, and distributed child-exploitative content on the Newstar Websites, and then laundered the illicit proceeds.



Doc. 29 at 21–23. A general, over-simplified outline of the Newstar Enterprise and its operating structure is pictured above.

Principals of the Newstar Enterprise included Florida resident K. Power (deceased) and his wife, Power. K. Power directed and controlled functions essential to the operation of the Newstar Enterprise. *See United States v. Kenneth Power*, Case No. 8:21-cr-32-SDM-AAS; Doc. 29 at 23. As a principal of the Newstar Enterprise, K. Power acted individually, through his corporate entity, Power Trading Inc. ("Power Trading"), and through bank accounts held by Power Trading. Doc. 29 at 23. K. Power ran the Newstar Enterprise with the assistance of his wife, Power. Power handled bookkeeping for the Enterprise and managed its financial affairs. Doc. 29 at 28–29.

Another Newstar Enterprise principal member was M.R.B. (deceased), who resided in Lutz, Florida. M.R.B., among other tasks, maintained webservers essential to the operation of the Newstar Enterprise and facilitated payment processing on behalf of the Newstar Enterprise. Doc. 29 at 23. M.R.B. acted in his personal capacity, through his corporate entities Bjorkman International, Inc. ("Bjorkman International") and Bjorkman Trans-Tech Inc. ("Bjorkman Trans-Tech"), as well as through bank accounts held by those entities. Doc. 29 at 23.

Newstar Enterprise members also included foreign nationals who recruited child-victims, photographers who routinely produced Newstar content, and members who helped build, maintain, operate and update the Newstar Websites. Doc. 29 at 24–25. One such member was Bulgarian national Plamen Velinov, who assisted with directing

12

and controlling the foreign functions of the Newstar Enterprise. *See United States v. Plamen Velinov*, 8:21-cr-342-VMC-SPF.

To populate the Newstar Websites with content, Newstar Enterprise members sourced, enticed, solicited, and recruited males and females under the age of 18, some of whom were prepubescent, to use as "child models" for the Newstar Websites. Doc. 29 at 24–26. Casting photos of child victims recovered on K. Power's electronic devices show that the Newstar Enterprise was vertically integrated—from recruitment to production and sale. Ex. I. Most of the child victims recruited by the Newstar Enterprise lived in Eastern Europe, and were particularly vulnerable due to their age, family dynamics, and poverty. Doc. 29 at 26. Using the recruited child-victims, the Newstar Enterprise produced more than 4.64 million images and videos intended for sale on the Newstar Websites. Doc. 29 at 24.

Other Newstar Enterprise members helped screen and verify new members and purchasers. The Enterprise maintained a membership list for subscribers and customers of the Newstar Websites, who numbered in the thousands from 101 nations across the world. Doc. 29 at 27.



To process and receive payments from these customers, Newstar Enterprise members opened, under false pretenses, payment processing accounts and associated merchant bank accounts held by Federal Deposit Insurance Corporation-insured ("FDIC-insured") banking institutions, as well as business checking accounts held by FDIC-insured banks. Doc. 29 at 27–28. When applying to open these accounts, members of the Newstar Enterprise intentionally provided the payment-processing companies and FDIC-insured banks with material misrepresentations about the nature of their business and the accounts' intended use, and did not fully and truthfully disclose the nature of the Newstar Websites nor the Newstar Enterprise. Doc. 29 at 27–28. The Newstar Enterprise also opened and used foreign bank accounts.

14

From approximately 2005 until 2019, the sale of content on the Newstar Websites generated at least $9,436,928.21 in revenue for the Newstar Enterprise. Doc. 29 at 28. The Newstar Enterprise therefore had a constant need—for the purposes of paying operating costs of the Enterprise and Newstar Websites, to perpetuate their function, and to distribute their fruits—to transfer and transmit money from payment-processor merchant accounts to domestic and foreign business and personal bank accounts. Doc. 29 at 27–28. Power was integral to and largely oversaw that process.

3. Power was a long-time, principal member of the Newstar Enterprise

Power joined the Newstar Enterprise no later than 2009. Doc. 29 at 21, 28. But she likely joined at its inception around 2005. The timing of the Powers' meeting and the launch of the Newstar Websites suggests that Power was somewhat involved in the Enterprise's founding or, at minimum, was aware of the business before 2009 and before her marriage to K. Power. Power had met K. Power in Moldova in 2004 while he was living there for a two-year period. PSR ¶60. Power had served as K. Power's translator and was thus privy to some of his Moldovan activities.

The Newstar Enterprise—the international members of which were primarily Russian speaking—was founded during this period. *See* Doc. 29 at 22. In 2005, K. Power sponsored Power's I-684 immigration petition. Ex. J. That year, K. Power, as the sponsor, listed his occupation as "internet sales, affiliate programs, webhosting." Ex. J. The petition listed his prior work history as having been a manager at Burger King and McDonalds. Ex. J. But beginning in March 2003, he reported himself as "self employed internet sales." Ex. J.

15

Power's visa application from 2005 also lists K. Power's occupation as "self employed internet sales." Ex. J. Her prior Moldovan employment was listed as "translator." Ex. J. Power's intended occupation in the United States section read: "employed by husband (self employed)." Ex. J. Power responded "no" to standard questions in the petition asking whether she had benefited from human trafficking or sexualized commercial acts. Ex. J.

By 2009, Power had willfully joined the Newstar Enterprise to oversee its finances, knowing that it existed solely to support the Newstar Websites and with knowledge of the Websites' content. Doc. 29 at 28. Regardless of whether Power became fully aware of the true nature of the Newstar Enterprise's business in 2005 or 2009, record evidence shows that by 2009 Power was a full-fledged, official member of the newly formed front and de facto holding company for the Newstar Enterprise— Power Trading. Power's ownership interest, title, role, responsibilities, and compensation at Power Trading suggest that she and her husband had something more akin to a co-equal partnership than they did an agency relationship. Power Trading's articles of incorporation and annual reports list Power as the company's "Vice President." Ex. N. Internal Revenue Service records as far back as 2010 list Power as a 50% shareholder. Ex. N. Florida Department of Revenue Employer's Quarterly reports beginning in 2010 and continuing for several years—bearing Power's signature and handwriting—list her title as "Vice President." Ex. N. Power also routinely signed checks to herself and her husband for "equity distribution," "salary," and "reimbursement." Ex. O.

Power's titles were not nominal. She bore important, active responsibilities within the Enterprise. Working down the hallway from her husband's home office—the office from which he managed the Newstar Websites and edited, vetted, and arranged to produce child pornography and child erotica for publication on those websites—Power served as the Newstar Enterprise's "bookkeeper" and managed its QuickBooks, oversaw its bank accounts, sent wires to coconspirators, filed annual and quarterly reports, signed checks, and opened bank accounts. Doc. 19 at 28–29; Ex. N.

As detailed above, populating the Newstar Websites with new content was the primary aim of the Enterprise. Laundered revenue cycled through Power Trading and



back to recruiters and photographers in Eastern Europe was therefore the Enterprise's lifeblood. For at least 10 years, Power pumped the heart. The December 2012 wires detailed below—sent using Power's Power Trading Wells Fargo portal— are an example of the thousands of transactions attributable to Power's role within the Enterprise over that period:



Ex. P. The $4,500 transfer depicted above made to a bank in the Czech Republic was to a Czech photographer, P.R., who routinely produced child pornography and child

erotica for the Newstar Websites. The $1,968 transfer made to Velinov represented payment related to his role of maintaining, designing, and updating the Newstar Websites.

Because financial data before January 2009 is not available, the full extent of the Newstar Enterprise's money laundering and profits are unknown. But from January 2009 until November 2019, Power knowingly laundered at least $4,677,025 for the Newstar Enterprise intending to promote and conceal its activities relating to the Newstar Websites. Doc. 29 at 30. During that period, she knowingly assisted in the transfer of roughly $2 million used to promote the Enterprise's ongoing victimization of children. Doc. 29 at 30. She and her family were handsomely rewarded for her work, profiting over $2.2 million in that period.

   4.  Power actively attempted to obstruct justice on multiple occasions

Power actively attempted to obstruct justice before and after law enforcement intervention and continued the financial affairs of the Newstar Enterprise after law enforcement contact. In addition, Power routinely counseled her husband and co-conspirators about how to evade law enforcement scrutiny. For example, in January 2018, an agent from Homeland Security Investigations tried to contact co-conspirator Patrice Wilowski to set up an interview. Wilowski turned to her Newstar Enterprise members for guidance on how to respond.

Hearing that a federal agent wanted to talk to Wilowski sent her coconspirators into high anxiety. Two of them—K. Power and M.R.B.—sent a flurry of emails to one another speculating as to what law enforcement knew about their business and

strategizing about how to prevent Wilowski from disclosing incriminating information. In these emails, K. Power told M.R.B. that Wilowski should retain a lawyer and that "[h]er freedom can be at stake, and any promise to not prosecute her is a lie." Ex. K. They began to craft a lie for Wilowski to tell law enforcement, specifically that she sends wires for website hosting, design, and consulting, and that she knows no further details. *Id*. The two also expressed great concern about Wilowski being left alone with the agent, and they thought that one of them should accompany her at the meeting to make sure she did not make incriminating statements. Ex. L.

Recovered emails show that Power played a significant role in crafting that lie and in counseling Wilowski through the crisis. Power, through her husband, explained that agents commonly perform "knock and talks" if they suspect criminal activity is present but do not have enough evidence for a warrant. Ex. Q. Power and her husband further counseled Wilowski to "say nothing even if they threaten as its all talk." Ex. Q. In another exchange with Wilowski, K. Power touted Power's experience in this area, stating:

> My wife has a degree in criminal justice and worked with fbi and state police for 3 months last summer. She still maintains it is a mistake to speak to them at all. They said to come talk to us so we can close this case…If there is a case she should not go and help them. She should cancel and say she consulted a lawyer who said if they said they have a case they need to present it. They don't and wont…my wife lived and breathed with investigators like this. She knows.

Ex. Q. As detailed below, Power had indeed interned at the Florida Department of Law Enforcement.

The next day, M.R.B. sent Wilowski an email containing advice and direction from K. Power, as informed by Power. Ex. M; Ex. Q. This email advised Wilowski to cancel the appointment with the HSI agent, ideally by calling his desk phone on the weekend to make sure the call would go to voicemail. It further stated that Wilowski should tell the agent that she does not have to speak to law enforcement and will not, and that "all wires going in and out of my account are legal and i have no need to explain anything to anyone. ( if she wants to)." The email also contained an instruction from K. Power to M.R.B. to *"[r]emember to not speak on the phone to her about business for a long time.. If you need to talk meet somewhere."* Ex. M. (emphasis added). Wilowski responded to this email stating "ok I will cancel the appointment," and did so.[6] Ex. M.

Many ordinary people in these circumstances would have immediately ceased all involvement with the Enterprise. Yet Power and her husband forged ahead. They continued to run the Newstar Websites and Power continued to counsel her husband and co-conspirators on how to evade law enforcement when laundering proceeds. For example, in October 2019, Power opened a Space Coast Credit Union bank account for Power Trading because other bank accounts used by the Newstar Enterprise had been closed. Ex. R. That same month, K. Power described his wife being "scared about wires coming from [Wilowski]" because Power thought "they are watching her…" and discussed the possibility of routing funds through contacts in Moldova. Ex. R. Power also appears to have complained—due to what her husband labeled as paranoia—that Newstar members' wires did not contain descriptions masking their true purpose,

---

[6] Wilowski, of course, had the right not to speak to the agent.

instructing that they use spurious wire descriptions such as "computer consulting" or "hosting support." Ex. R. The next month, Power instructed her husband to pick up money from Wilowski in cash to avoid a Wilowski-tainted paper trail. Ex. R. Power also suggested that Wilowski send ACH wires instead of federal wires because they are "safer." Ex. R.

As these correspondence indicate, Power's involvement in the Newstar Enterprise continued for more than a year and a half after law enforcement's contacting Wilowski, ceasing only in November 2019 when investigators seized the Newstar Websites' servers and executed simultaneous search warrants at her and her husband's home, the Bjorkman residence, and the Wilowski residence. And even then, Power continued to attempt to obstruct justice. Power's post-*Miranda* search warrant interview was rife with half-truths, deceptive answers, false exculpatory statements and outright lies. Power repeated the prefabricated story that Power Trading conducts "hosting and web design and programming," in addition to "computer consulting." She denied knowing what was being hosted, designed, programmed or consulted on, further stating that her husband merely subleases blind server space. She claimed she did not know the names of Power Trading's 12 employees. She falsely characterized her role as simple: logging into QuickBooks and clicking "yes yes yes yes." Power also denied knowing the Bjorkmans and Wilowski—statements that were obviously false given her decade-long business and personal relationship with both families. For example, after Power

denied knowing Wilowski,

Homeland Security Investigations

obtained photographs of them

together at Power's house. Ex. S. In

addition, after Power denied

knowing who the Bjorkmans were,

Mary Lou Bjorkman told the



United States that she had met socially with Power and had even purchased Power a

firearm while their families visited a shooting range together. *See* Ex. S. Even at her

bond hearing in this matter, Power adamantly continued to lie—yelling over her

counsel to the court that she did not have any foreign contacts or bank accounts in

Moldova.

Power's continued management and work for the Newstar Enterprise after law-

enforcement contact, her persistence in deceiving and aiding coconspirators to deceive

law enforcement, and her falsehoods to law enforcement during the search of her

residence weigh in favor of a guidelines sentence.

### B.    History and characteristics of the defendant

Power's history and characteristics also weigh strongly in favor of guidelines

sentence. Her history and personal characteristics do not support a downward

departure or variance. If anything, they reveal aggravating factors.

Power is not a defendant with a low IQ or other mental, emotional, or social

disabilities. She has no history of mental illness or emotional problems. PSR ¶67. Nor

23

did she suffer from any drug additions or other habits normally associated with financial stress that might help explain her offense conduct. PSR ¶¶65–68. By all measures, Power is an extremely intelligent, capable, well-educated, resilient, and successful person. After graduating high school in Moldova with honors she received a scholarship to attend the State University of Moldova, graduating with a bachelor's degree in English and literature. PSR ¶71. After immigrating to the United States, she attained a Master of Science in Criminal Justice from Nova Southeastern University, posting an impressive 4.0 GPA. PSR ¶70. She's fluent in Romanian, Russian, and English, and has limited fluency in French. PSR ¶74. She has successfully held numerous jobs over the years, including work as a substitute teacher for Broward County Public Schools, a code enforcer for the City of Weston, and an interpreter for the Ruviplest Translation Bureau. PSR ¶¶76–78.

Even more aggravating and not noted in the PSR is that, during the offense conduct, Power worked as an intern for the Florida Department of Law Enforcement. Ex. T. Indeed, as detailed above, K. Power often invoked her law enforcement experience and education when relaying her directives and advice to Newstar coconspirators about how to evade detection by law enforcement.

Moreover, the PSR does not reveal anything remarkable about Power's childhood or life that could fully explain her offense conduct. Although her family struggled financially in Moldova and although she was raised by only one parent, she reported that her mother "instilled moral values" during her childhood. PSR ¶59. And, although Power's relationship with K. Power reportedly became physically and verbally

abusive and although she struggled to raise a disabled son, her tenure in the Newstar Enterprise likely predated her son's birth and certainly predated the reported abuse. *See* PSR ¶¶60–64. What is more, her tenure with the Newstar Enterprise continued well-past her permanent residency in the United States (2005) and naturalization (2010). PSR ¶62.

Power's personal history and characteristics ultimately do not weigh in favor of a downward departure or variance.

**C.    Seriousness of the Crime, Promoting Respect for the Law, and the Need for Just Punishment and to Avoid Unwarranted Sentencing Disparities**

"Retribution is a valid penological goal." *Glossip v. Gross*, 135 S. Ct. 2726, 2769 (2015) (Scalia, J. concurring). Punishment is the way in which society expresses denunciation of wrongdoing, and it is thus essential that this Court promote and maintain respect for the law by pronouncing sentences that fully reflect society's revulsion. *See Gregg v. Georgia*, 428 U.S. 153, 184 n. 30 (1976). Here, the seriousness of the crime, taken with the need for just punishment, the need to avoid unwarranted sentencing disparities, and the goal of promoting respect for the law, weigh heavily in favor of a guidelines sentence.

1.    Promoting respect for the law

This Court's sentence must reflect the need to "promote respect for the law." 18 U.S.C. § 3353(a)(2)(A). When Congress passed the Protection of Children against Sexual Exploitation Act of 1977, it sought to address the organized, nationwide child pornography industry that was generating millions of dollars through the exploitation

of children. S. REP. 95-438, 5, 1978 U.S.C.C.A.N. 40, 42-43. The Act, which included 18 U.S.C. § 2251, was aimed at filling a void in federal law by targeting the production of materials depicting child abuse. S. REP. 95-438, 5, 1978 U.S.C.C.A.N. at 56. But the Act, and its later amendments, are more than prophylactic measures. They reflect value judgments and accepted moral norms of our society. As one Senate Judiciary Committee report concluded: "the use of children…as the subjects of pornographic materials is very harmful to both the children and the society as a whole," describing the conduct as "outrageous." S. REP. 95-438, 5, 1978 U.S.C.C.A.N. at 43. Indeed, child sexual abuse "is grossly intrusive in the lives of children and is harmful to their normal psychological, emotional and sexual development in ways which no just or humane society can tolerate." *See Kennedy v. Louisiana*, 554 U.S. 407, 468 ((Alito J., joined by Roberts, C.J., Scalia, and Thomas, JJ., dissenting) (quoting C. Bagley & K. King, Child Sexual Abuse: The Search for Healing 2 (1990)).

Power's actions violated federal law, but also displayed a gross indifference toward accepted social norms that undergird our laws protecting children. Her conduct also shows that she has no respect for our nation's financial system. For more than a decade, Power made millions of dollars by sexually exploiting vulnerable children in Eastern Europe and abused our nation's financial system in the process. Power and her husband reaped at least $2,211,651 in Newstar profits between January 2009 and November 2019, which supported a luxurious lifestyle in a million-dollar South Florida home. Doc. 29 at 30. What is more, that figure does not account for profits between 2004 and 2009, for which financial data is unavailable. *See* Doc. 29 at 30.

26

Moreover, Power actively attempted to conceal the Newstar Enterprise's crimes, obstruct justice, and continued her work for the Enterprise for years after law enforcement contact. This Court's sentence must express an appropriate level of social condemnation of her crimes. A downward variance does not achieve that end.

    2.  <u>Impact on the victims</u>

This Court's sentence must also consider those victimized by Power's conduct. Power abused our nation's financial system for over a decade. Although the financial institutions suffered no identifiable financial losses, Power's conduct was nonetheless disruptive to their healthy function and undoubtedly exacted indirect costs on their operation. Her conduct and that of her coconspirators also exposed merchant processing companies, their banking partners and other FDIC insured banks to reputational harm by leveraging their services and platforms to help fund the continuing operation of an international child exploitation enterprise.

More troublingly, Power's criminal conduct perpetuated the victimization of the Newstar Websites' child-victims. Most of the child-victims, recruited by the Newstar Enterprise in Ukraine, Moldova, and other nations in Eastern Europe, were particularly vulnerable due to their age, family dynamics and poverty. Doc. 29 at 26. For roughly 15 years, more than one hundred of these children—often prepubescent and many as young as 6-years old, were exploited by the Newstar Enterprise to produce more than 4.64 million images and videos. Doc. 29 at 24. Nearly all these depictions (produced using funds that Power had participated in laundering and paid for by Power Trading) were sexualized, and many involved the victims engaged in sexually explicit conduct.

*See* Doc. 29 at 22–26. The depictions were sold and circulated to customers located in 101 nations across the world. Doc. 29 at 27. The depictions doubtlessly now circulate in perpetuity. Even today, "Newstar" content is a common feature of child pornographers' collections recovered by law enforcement.

As the Supreme Court has recognized, "[t]he distribution of photographs and films depicting sexual activity by juveniles is intrinsically related to the sexual abuse of children .... [T]he materials produced are a permanent record of the children's participation and the harm to the child is exacerbated by their circulation..." *See New York v. Ferber*, 458 U.S. 747, 758–59 nn. 9–10 (1982) (citations omitted). A guidelines sentence is necessary to recognize the victims (both identified and unidentified) directly and indirectly harmed by Power's conduct and to restore public confidence in our laws.

**D. Adequate deterrence and the need to protect the public**

This Court's sentence must also afford adequate deterrence to criminal conduct. 18 U.S.C. § 3553(a)(2)(B). Section 3553(a)'s legislative history demonstrates that Congress viewed deterrence as "particularly important in the area of white-collar crime." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (quoting S.Rep. No. 98–225, at 76 (1983)); *United States v. Livesay*, 525 F.3d 1081, 1094 (11th Cir. 2008). Defendants in white-collar crimes often calculate the financial gain and risk of loss, and white-collar crime therefore can be affected and reduced with serious punishment. *Martin*, 455 F.3d at 1240. Because economic and fraud-based crimes are "more rational, cool, and calculated than sudden crimes of passion or opportunity," these crimes are "prime candidate[s] for general deterrence." *Id.*

28

Power's work for the Newstar Enterprise was premeditated and appears to have been purely motivated by greed and a risk/reward calculus—precisely the type of crime amenable to general deterrence. *See id*. Moreover, Power's continued work for the Newstar Enterprise—for nearly two years after direct law enforcement contact—suggests that she is somewhat resistant to deterrence. But beyond merely deterring Power from engaging in future fraud, money laundering, and child exploitative activities, this Court should also impose a guidelines sentence to send a strong warning to other individuals currently involved in or considering similar conduct. Only a guidelines sentence adequately deters this type of criminal conduct and protects the community.

## IV.      Conclusion

This Court should sentence Power to a guidelines sentence. Nothing in the offense conduct or Power's history and characteristics warrants a further downward departure or downward variance. A guidelines sentence is the only reasonable sentence because it is the only sentence that reflects the seriousness of Power's crimes, provides just punishment for those crimes, fully protects vulnerable members of our community, and promotes respect for the law.

Respectfully submitted,

ROGER B. HANDBERG
United States Attorney

By:     */s/ Francis D. Murray*
FRANCIS D. MURRAY
Assistant United States Attorney

Florida Bar No. 0108567
400 N. Tampa Street, Ste. 3200
Tampa, FL 33602
Phone:  (813) 274-6000
Fax:    (813) 274-6103
Email: francis.murray2@usdoj.gov

*/s/Kyle P. Reynolds*
KYLE P. REYNOLDS
Trial Attorney
U.S. Dept. of Justice, Criminal Division
Child Exploitation and Obscenity Section
New York Bar No. 4703856
Authorized to Practice Under L.R.
2.01(a)
1301 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 616-2842
Facsimile: (202) 514-1793
Email: Kyle.Reynolds@usdoj.gov

**U.S. v. Power**                    **Case No. 8:21-cr-244-MSS-AAS**


## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 7, 2022, I electronically filed the foregoing

with the Clerk of the Court by using the CM/ECF system which will send a

notice of electronic filing to the following:

Bruce H. Lehr, Esq.


<u>/s/ Francis D. Murray</u>
Francis D. Murray
Assistant United States Attorney
Florida Bar No. 0108567
400 N. Tampa Street, Ste. 3200
Tampa, FL 33602
Phone: (813) 274-6000
Fax: (813) 274-6103
Email: francis.murray2@usdoj.gov